IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| E.M., a minor child, b/n/f/ MR. J.M. and MRS. J.M. | § § § | |
| Plaintiffs, | § § | Civil Action No. 1:17-cv-387 |
| v. | § § | |
| AUSTIN INDEPENDENT SCHOOL DISTRICT, | § § | |
| Defendant. | § | |

## AUSTIN INDEPENDENT SCHOOL DISTRICT'S MOTION TO DISMISS

Austin Independent School District (AISD or the District) moves to dismiss plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6), and (1).

### Introduction and Summary of the Argument

This Title IX lawsuit arises out of a high school student, E.M.'s, belief that she was the victim of sexual harassment perpetrated by another student, D.M. As explained below, plaintiffs' pleadings reveal that any harassment she experienced, as well as any lingering effects she experienced after the period of alleged harassment ended, fell far short of the sort of conduct that is proscribed by Title IX. Furthermore, plaintiffs' own factual allegations affirmatively establish that the District complied with its duties under Title IX. Because the factual allegations conclusively establish that the District did not violate Title IX, plaintiffs fail to state a claim and this case must be dismissed.

**Relevant Factual Allegations Pled by Plaintiffs**

The factual allegations relevant to plaintiffs' claim of harassment are:

- When school started in August 2016, E.M. befriended D.M., a student with obvious visual impairments and social inadequacies. E.M. could tell that D.M. wanted to have a boyfriend-girlfriend type relationship and quickly told him she just wanted to be friends. He said that would be OK, but did not act like it was OK. *See* Dkt. No. 8 at ¶ 41.

- Early in the school year, D.M. would insert himself between E.M. and her friends when they were talking at school. He would also attempt to physically get between E.M. and her friends. By the end of September 2016, E.M. began to suspect D.M. wanted to be more than just friends. She soon made it very clear to D.M. that she just wanted to be friends but D.M. would not take no for an answer. *See id*. at ¶ 42.

- D.M. sent E.M. a text message asking her to go on a date. She told him "no," that she only wanted to be friends, she asked if he was okay with that. D.M., who did not respond until the next day, told her he would be glad to have her as a friend. *See id*. at ¶ 43.

- D.M. then became verbally and physically aggressive with E.M. On occasion, D.M. would stand over her while other students were nearby. *See id.* at ¶ 44.

- D.M. hugged E.M. after she told him to stop. After "one particularly unwarranted and prolonged embrace" E.M. told D.M. not to touch her anymore at all. D.M. would not stop touching her. *See id*. at ¶ 45.

- D.M. followed E.M. around the school and stalked her, and would grunt and make odd noises when E.M. would not acknowledge him. *See id*. at ¶ 45.

- One two occasions, D.M. got into E.M.'s car and would not get out after being asked. On each occasion, D.M. demanded that E.M. take him out for dinner. The first time, E.M. acquiesced and took him to get tacos and he attempted to force her to pay. The second time, E.M. was more forceful in asking D.M. to leave the car and D.M. eventually complied. *See id*. at ¶ 47.

- D.M. would place his personal belongings in E.M.'s car as a pretense to try and force her to take him home after school. *See id*. at ¶ 47.

- While on a bus to a choir event, D.M. forced E.M. to step over his legs to get to her seat. On other occasions, he would position himself such that E.M. was forced to sit

2

by him. On one occasion the Choir Director observed D.M.'s behaviors and asked him to move away from E.M. The Choir Director was emphatic and curt with D.M. so that he would change his seat after he initially refused. *See id*. at ¶ 48.

- Throughout the Fall 2016 semester, when D.M. and E.M. were near each other, and E.M. would fail to acknowledge him, D.M. would often shake his head, rock back and forth, and clutch his arms tightly around himself in a visual display of emotion and displeasure. *See id.* at ¶ 49.

- On one occasion when E.M. rejected D.M. during choir, D.M. tore up his sheet music, thrashed around on the floor and shouted, requiring the Choir Director to dismiss the rest of the choir and clear the room where D.M was acting out. *See id*. at ¶ 50.

- During the Fall 2016 semester, D.M. stabbed himself with a pen in front of his teachers. E.M. observed the wounds on D.M.'s arms. D.M.'s parents, concerned about their son's deteriorating mental state, as well as D.M.'s harassment of E.M., reported both to School Officials who never investigated and never contacted E.M.'s parents. *See id.* at ¶ 51.

- On January 18, 2017, D.M. tried to kill himself by lowring himself over a second story rail at the school and purposefully letting go of the rail in front of E.M. D.M. was caught on the floor below by the teacher and was not seriously harmed, although E.M. did not see that. *See id*. at ¶ 54.

- On January 31st, E.M. received a safety plan. The plan provided that E.M. be escorted to all her classes by the school's security guards. It also provided that D.M.'s schedule would be monitored to minimize chance encounters. *See id*. at ¶ 72.

- On February 17th, D.M. appeared in E.M.'s choir class. *See id*. at ¶ 73.

- On February 28th, D.M. and E.M. crossed paths in the hallway. At that time neither student had an escort with them. *See id*. at ¶ 77.

- On March 2d, D.M. and E.M. crossed paths. D.M. came close to E.M. and made a menacing glance in her direction. *See id*. at ¶ 78.

- On March 9th, D.M. followed E.M. and moved to within a few feet from her. E.M. attempted to move to another location but D.M. stalked her. E.M. told her friends and texted a security guard. The guard arrived after about 15 minutes. During the period in between, D.M. followed E.M. and friends very closely. E.M. and her

3

    friends changed directions about 20 or 30 times but D.M. still followed them. They zigged and zagged trying to get away from D.M., but he still stalked E.M. The guard did not remove D.M. from the area. D.M. continued to stand with E.M. and friends. *See id.* at ¶ 79.

- On April 12th, D.M. came into the choir classroom to sing and prepare for a UIL Choir Competition. The Choir Director escorted E.M. into an office connected to the choir room, seated E.M., and shut the door. E.M. was able to hear D.M signing through the door and walls and she began to have a panic attack. E.M. then left the room, and walked past D.M. and other students. *See id.* at ¶¶ 88-91.

## **Argument**

### A.   *Standard of Review.*

#### 1.   *Rule 12(b)(6).*

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party. *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). The Supreme Court in *Iqbal* explained that *Twombly* illustrates the applicable "two-pronged approach" to determine whether a complaint states a plausible claim for relief. *Iqbal*, 556 U.S. at 679.

First, the Court must identify those pleadings that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Legal conclusions "must be

supported by factual allegations." *Id.*  Upon identifying the well-pleaded factual allegations, the court must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

### 2. Rule 12(b)(1).

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge the Court's exercise of subject-matter jurisdiction over a case. *See Den Norske Stats Oljeselskap As v. Heeremac V.O.F.*, 241 F.3d 420, 424 (5th Cir. 2001). "In ruling on a motion to dismiss for lack of subject matter jurisdiction, a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.*  A court must accept all factual allegations in the plaintiff's complaint as true, and the burden of establishing a federal court's subject matter jurisdiction rests "with the party seeking to invoke it." *See Pedrozo v. Clinton*, 610 F. Supp. 2d 730, 733 (S.D. Tex. 2009); *see also Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### B.    Title IX.

In order for plaintiffs to properly plead a claim under Title IX, they must allege that: (1) AISD receives federal funds, (2) AISD had actual knowledge of D.M.'s alleged harassment of E.M., (3) D.M. was under AISD's control, (4) D.M.'s alleged harassment was based on E.M.'s sex, (5) D.M.'s alleged harassment of E.M. was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an education

opportunity or benefits," and (6) the district was deliberately indifferent to D.M.'s alleged harassment of E.M. *See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (quoting *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (internal quotations and alteration in original)). In this case, there is no dispute that the District receives federal funds. But, review of plaintiffs' live complaint reveals that plaintiffs fail to plead factual allegations supporting the second, fifth, and sixth elements of their claim.

### C.  *There is no private right of action under Title IX.*

While the District acknowledges that the United States Supreme Court has recognized the existence of a private right of action under Title IX for student-on-student harassment, the Court's articulation of the right is fundamentally flawed, and should be rejected. *See Davis*, 119 S. Ct. at 1677-1692 (Kennedy, J., joined by Rehnquist, C.J., Scalia and Thomas, J.J., dissenting).[1] Accordingly, plaintiffs fail to state a claim on which relief can be granted and this case should be dismissed. Fed. R. Civ. P. 12(b)(6).

### D.  *Plaintiffs do not allege severe and pervasive harassment.*

Title IX does not impose liability for all forms of harassment. Instead it requires a showing of harassment that is severe, pervasive, and objectively offensive. In the school context, the Fifth Circuit has observed that:

> Dating and relationships are an inescapable part of high school, as is the resulting stress. It is a trying time for young people who experience a wide range of emotions and often lack the skills to control them. J.H. was acting like a typical high-school girl whose ex-boyfriend began dating a younger

---

[1] Of course, the District recognizes this Court's duty to apply existing Supreme Court precedent. The District advances this point for purposes of error preservation in any subsequent appellate proceeding.

6

>   cheerleader. That is the sort of unpleasant conflict that takes place every day in high schools, and it is not the proper stuff of a federal harassment claim.

*Sanches*, 647 F.3d at 167.

Courts have recognized that "[s]tudent-on-student sexual harassment claims under Title IX are limited only to those based on 'pervasive' and 'widespread' conduct, such as daily mocking and constant name calling, with the 'systemic effect of denying the victim equal access to an educational program or activity.'" *Reed v. Kerens Indep. Sch. Dist.*, No. 3:16-CV-1228-BH, 2017 WL 2463275, at *10 (N.D. Tex. June 6, 2017) (finding plaintiff had alleged a Title IX violation based on a 5-year pattern of daily teasing and mocking culminating in the student's suicide) (citing and quoting *Carmichael v. Galbraith*, 574 F. App'x 286, 289-90 (5th Cir. 2014) (per curiam)). Moreover, the conduct must be objectively offensive, meaning that a plaintiff's subjective reaction to otherwise non-offensive conduct cannot render otherwise non-pervasive and non-severe conduct sufficient to sustain a Title IX claim. *Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 932 (C.D. Ill. 2002). Courts have, therefore, refused to find Title IX violations for severe, yet non-persistent harassment. *See Wilson v. Beaumont Indep. Sch. Dist.*, 144 F. Supp. 2d 690, 696 (E.D. Tex. 2001) (holding that a single instance of sexual molestation, while "unarguably severe," could not satisfy Title IX's requirement of severe, pervasive, and objectively offensive conduct that could have deprived the student of an educational benefit).

### *1. The allegations of conduct prior to D.M.'s alleged suicide attempt.*

The allegations E.M. makes fall far short of the conduct at issue in *Davis*. In *Davis*, the plaintiff alleged overtly sexual conduct that involved attempts at groping and sexually-charged statements that occurred on numerous occasions over five months, and that were promptly reported to the school district. *See generally Davis*, 526 U.S. 629 (1999). None of the allegations in E.M.'s complaint involve conduct that is overtly sexual; rather, plaintiffs pled that D.M. engaged in a pattern of annoying conduct directed towards E.M. Specifically, plaintiffs plead that D.M.: (1) followed E.M., (2) tried to sit near E.M., (3) tried to sit between E.M. and her friends, (4) hugged E.M., (5) grunted and shook his head, (6) stabbed himself with a pen, and (7) had a fit in choir practice. *See* Dkt. No. 8 at ¶¶ 41-51. Regardless of E.M.'s subjective reaction to D.M.'s alleged conduct, viewed objectively, D.M.'s conduct was, at worst, boorish behavior of the type that courts recognize occurs in schools. *See Sanches*, 647 F.3d at 167. But, unlike cases in which a finding of severe and pervasive harassment was sustained, D.M.'s conduct was not sexual in nature or sufficiently pervasive to be actionable under Title IX.

### *2. The allegations related to D.M.'s alleged suicide attempt.*

The crux of E.M.'s complaint is that D.M. allegedly tried to commit suicide in front of her. *See generally* Dkt. No. 8. The District has not located any cases where an alleged harasser's attempted suicide constituted conduct that was sufficiently severe, pervasive, and objectively offensive to constitute harassment under Title IX. Different than a Title IX student-on-student harassment case in which the plaintiff alleges that pervasive harassment caused them to attempt suicide; here, E.M. claims that D.M. harassed her when he

attempted to harm himself. *See id*. While witnessing a suicide attempt might certainly be shocking, it does not cause direct injury to the witness. Rather, any injury is akin to a tort-based bystander claim. Nothing in Title IX case law allows a plaintiff to assert a gender-based harassment claim on the mere witnessing of another student's alleged suicide attempt. This Court should not expand Title IX's ambit by permitting plaintiffs' bystander claim to proceed.

### 3. *The allegations of conduct after D.M.'s alleged suicide attempt.*

With respect to E.M.'s allegations of conduct that post-date the alleged suicide attempt, these fall into three categories: (1) E.M. making visual contact with D.M. while they passed through school common areas, (2) D.M. allegedly following E.M. on one occasion, and (3) D.M. glaring at her. *See* Dkt. No. 8 at ¶¶ 73, 77, 78, 79, 88-91, 101. Plaintiffs plead that these events transpired on just five separate days over a span of four months after the District initiated remedial efforts. *See id*. Notably, E.M. fails to plead that she and D.M. had any physical contact or even spoke to each other. Having to see or hear another student is simply not objectively offensive.

If the Court were to treat E.M.'s subjective responses to her spotting D.M. on campus as evidence of objective harassment, the Court would impermissibly import a subjective standard into Title IX that is divorced from any actions attributable to the alleged harasser. Such an analysis is foreclosed by controlling authority. *See* Part B, pp. 5-6, *supra*.

### E. Plaintiffs' pleadings fail to demonstrate that any appropriate AISD official had actual knowledge of the alleged harassment prior to D.M.'s alleged suicide attempt.

Even assuming plaintiffs' allegations established severe and pervasive harassment, in order for a school district to be subjected to liability under Title IX for peer-on-peer sexual harassment, a school official ". . .who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf . . ." must have actual knowledge of harassment directed to the plaintiff. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S. Ct. 1989, 1999 (1998) (articulating Title IX private action standard in teacher-student harassment context); *see also generally Davis*, 526 U.S. 629 (applying the same standard in student on student harassment context). The Supreme Court imposed this requirement in order to prevent Title IX from collapsing into a font of tort liability. *See Gebser*, 118 S. Ct. at 1999-2000. Moreover, because Title IX is a funding clause statute, the local governmental entity can only be held liable when it, acting through an appropriate agent, makes the conscious choice to fail to remedy discrimination and thereby risk federal funding. *See id*.

Plaintiffs' live complaint is devoid of any allegation that an appropriate official had actual knowledge of any harassment D.M. directed towards E.M. until after D.M.'s purported suicide attempt on January 18, 2017. In fact, plaintiffs do no more than allege that D.M.'s parents had shared their concerns about D.M.'s alleged fixation on E.M. with a school counselor. *See* Dkt. No. 8 at ¶¶ 51-52.[2]

---

[2] Plaintiffs also vaguely plead that D.M.'s parents made a report to "School Officials." *See* Dkt. No. 8 at ¶ 51. But plaintiffs fail to identify who these school officials were and, without identifying them, the allegations cannot support the conclusion that the "School Officials" possessed the authority required by Title IX.

A counselor is not vested with authority under Texas law to make decisions that could potentially deprive a school district of its ability to receive federal funding. *See* Tex. Educ. Code Ann. § 11.151(b) (providing that a Texas school district's elected board of trustees has the exclusive power to manage and govern the school district); *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995) (holding that the school district's board of trustees is the district's policy maker). Plainly, a counselor, who does not, as a matter of Texas statutory law, exercise any governance function for the school district, is not an appropriate school official. *See generally* Tex. Educ. Code Ann. § 11.151(b) (vesting exclusive governance power in the District's board of trustees), 11.1511 (defining specific duties and powers of the board of trustees), 11.201 (detailing the authority of a school superintendent).

Furthermore, even if a counselor were an appropriate official for purposes of Title IX, plaintiffs' complaint fails to detail what D.M.'s parents actually told the counselor. *See generally* Dkt. No. 8. Without factual allegations detailing the substance of D.M.'s parents' communications, plaintiffs cannot establish that the counselor had actual knowledge of any specific harassment directed towards E.M. *See id*. Nor could the Court – based upon plaintiffs' conclusory allegations – infer that the counselor had any reason to believe that D.M. would attempt suicide as a means of harassing E.M. *See id*. Tellingly, plaintiffs never plead that either E.M. or her parents ever raised any concern with the District before D.M.'s alleged suicide attempt. *See id*.

Solely for purposes of this motion, the District will assume that the campus' acting principal, Susan Leos, was an appropriate official for Title IX's purposes. Plaintiffs'

11

pleadings do not allege that Leos had any knowledge of D.M.'s alleged harassment of E.M. until after D.M.'s alleged suicide attempt. *See id*.

### F. Plaintiffs' allegations negate their ability to establish that AISD was deliberately indifferent to any alleged harassment.

If the Court concludes that plaintiffs have pled that the District had knowledge of actionable harassment, they still must plead factual allegations showing that the District breached its duty to respond to the facts it was aware of. To establish a breach of duty under Title IX, plaintiffs must plead facts that could, if true, establish that the District was deliberately indifferent to the actual knowledge it possessed.

The deliberate indifference standard employed in Title IX cases is identical to that developed in section 1983 municipal liability jurisprudence. Consequently, "a school district should be 'deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) (citing and quoting *Davis*, 526 U.S. at 650 (quotation in original). "Accordingly, '[o]fficials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, 'even if the harm ultimately was not averted.'" *Id*. (quoting *Doe ex rel. v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (quotations and alteration in original)).

Even assuming, solely for the sake of argument, that D.M.'s purported suicide attempt could constitute severe and pervasive harassment, the District's response to the attempt, as described by plaintiffs, was objectively reasonable. According to plaintiffs,

appropriate school officials were aware that D.M. may have attempted to commit suicide because of his feelings for E.M. *See* Dkt. No. 8 at ¶¶ 59-63.

Plaintiffs' complaint does not plead facts that could ever give rise to a finding of deliberate indifference. Quite the opposite. Plaintiffs identify the following actions taken by the District in response to E.M.'s concerns:

- Development, and subsequent modification, of a safety plan;
- Development of a "Specifics for Choir Safety Plan";
- Provision of an escort for E.M. when changing classes;
- Assignment of a specific security guard, Lamont Fisher, to shadow E.M.; and
- Assigning E.M., at her parents' request, to a new counselor.

*See* Dkt. No. 8 at ¶¶ 63, 72, 75, 77, 87. Indeed, plaintiffs judicially admit that the District responded to plaintiffs' concerns when they affirmatively plead that "***[t]he District attempted to provide a safety plan for E.M. but it failed.***" *See* Dkt. 8 at ¶ 95 (emphasis added).

Neither the deliberate indifference standard nor Title IX require that a school district's remedial actions guarantee success. *Doe*, 220 F.3d at 387-89 (affirming summary judgment and holding that, even though school principal ". . . concluded, in error, that J.H.'s allegation was not true, and her erroneous conclusion had tragic consequences[]" the principal was not deliberately indifferent to sexual molestation because she took steps to investigate the allegations.). In fact, in recognizing a private right of action for peer-on-peer sexual harassment, the Supreme Court, responding to the dissent's concern that school

13

districts would labor under a duty to remedy peer harassment, expressly rejected the argument that underpins plaintiffs' complaint:

> ***The dissent consistently mischaracterizes this standard [the deliberate indifference standard] to require funding recipients to 'remedy' peer harassment*** . . . and to 'ensur[e] that . . . students conform their conduct to certain rules . . . ***Title IX imposes no such requirements***.

*Davis*, 119 S. Ct. at 1674 (emphasis added). In short, a school district's duty under Title IX is to respond, not to remedy harassment or institute any specific remedial measures requested by a student or their parents. *See id*.

As noted above, plaintiffs' complaint identifies only five post-January 18th encounters between D.M. and E.M. that were spread out of four months. *See* Dkt. No. 8 at ¶¶ 72-93. And not one of the encounters involved physical or verbal contact between the two. *See id*. The real thrust of plaintiffs' complaint is not that D.M. continued to harass E.M. after January 18, 2017, but that she had to endure a few isolated occasions when she saw him or heard his voice. The District's efforts to end any alleged harassment were plainly reasonable and, largely, successful. Stated differently, while the District's actions did not provide the result the plaintiffs wanted, they were reasonable. That is all Title IX requires.

In short, on the facts alleged, if the Court permits plaintiffs to proceed with their Title IX claim, the District will be subject to the burden and expense of litigation, and potential liability, based on a standard that is not supported – and is directly contradicted by – controlling authority. *See Doe*, 220 F.3d at 387-89 (refusing to hold the school district liable under Title IX when it failed to prevent a teacher's ongoing molestation of students).

G.     *E.M.'s parents lack standing to assert their own claim for damages under Title IX.*

In the complaint's prayer for damages, E.M.'s parents appear to seek monetary damages on their own behalf. *See* Dkt. No. 8 at ¶¶ 109-110 ("As a direct and proximate result of the Defendants' conduct, E.M. ***and her parents have suffered injuries and damages, which they seek compensation for*** . . . .") (emphasis added). Because the only claim pending is a Title IX claim, it follows that E.M.'s parents seek damages under Title IX. Parents lack standing, as a matter of law, to seek their own damages under Title IX.

Title IX provides "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *See* 20 U.S.C. § 1681(a). The Fifth Circuit's decision in *Rowinsky v. Bryan Independent School District*, forecloses a parent's ability to assert a claim under Title IX on her own behalf for alleged injuries to her child. Specifically, the Fifth Circuit held:

> nothing in the statutory language provides [a parent] with a personal claim under title IX. Even assuming that title IX protects persons other than students and employees, [the parent] has failed [to] assert that she was excluded from participation, denied the benefits of, or subjected to discrimination under any education program or activity. Absent such a claim, the plain language of title IX does not support a cause of action by [the parent].

*Rowinsky*, 80 F.3d 1006, 1010 n.4 (5th Cir. 1996), *overruled on other grounds, Davis*, 526 U.S. 629 (1998) (insertions added); *see also A.W. v. Humble Indep. Sch. Dist.*, 25 F. Supp. 3d 973, 985-86 (S.D. Tex. 2014). Therefore, because E.M.'s parents did not, and cannot, plead that they were excluded from enrolling in AISD, denied any educational benefit, or

suffered any discrimination under any AISD education program (let alone, any such harm based on their sex), E.M.'s parents lack individual standing under Title IX, and their damages claim must be dismissed pursuant to Rule 12(b)(1). *See A.W.*, 25 F. Supp. 3d at 985-86.

## Conclusion and Prayer

Because plaintiffs' factual allegations, even when taken as true and after two pleadings amendments, fail to rise to the level of a Title IX violation, this Court should grant the District's motion to dismiss, dismiss plaintiffs' claims with prejudice, and award the District its taxable costs of Court.

Respectfully submitted,

Rogers, Morris & Grover, L.L.P.

/s/ - Richard A. Morris

Richard A. Morris
State Bar No. 14497750
Fed. I.D. No. 15004
rmorris@rmgllp.com
Jonathan G. Brush
State Bar No. 24045576
Fed I.D. No. 619970
jbrush@rmgllp.com
5718 Westheimer Rd., Suite 1200
Houston, Texas 77057
Telephone: (713) 960-6000
Facsimile: (713) 960-6025

ATTORNEYS FOR AISD

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Martin J. Cirkiel<br>
Cirkiel & Associates, P.C.<br>
1901 E. Palm Valley Boulevard<br>
Round Rock, Texas 78664

/s/ - Jonathan G. Brush

Attorney for AISD