IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| E.M. a minor by NEXT FRIENDS and PARENTS, MR. J.M. and MRS. J.M. | § § § | |
| v. | § § | A-17-CA-387 LY |
| AUSTIN INDEPENDENT SCHOOL DISTRICT | § § § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO: THE HONORABLE LEE YEAKEL
UNITED STATES DISTRICT JUDGE

Before the Court are AISD's Motion to Dismiss (Doc. No. 13); Plaintiffs' Response (Dkt. No. 16); and AISD's Reply (Dkt. No. 19). The District Court referred these Motions to the undersigned Magistrate Judge for report and recommendation.

**I. BACKGROUND**

In August of 2016, E.M., then a high school junior, began attending James Bowie High School after her family had moved into the Austin area. She met D.M., a visually impaired male student at Bowie, and over the course of that August and September they became friends. She asserts that over time, D,M. became obsessed with her and harassed her in and outside of school. The alleged harassment culminated in an event where D.M. lowered himself over a school balcony in front of a number of students including E.M., in an apparent attempt at suicide. E.M. alleges that before and after the incident, AISD violated Title IX by failing to keep D.M. away from E.M. Through her parents as next friends, E.M. has filed this suit against AISD seeking damages, equitable relief, and attorney's fees. AISD moves to dismiss the case for failure to state a claim.

## II. STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of an action "for failure to state a claim upon which relief can be granted." While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations in order to avoid dismissal, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also, Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* A complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating a motion to dismiss, the Court must construe the complaint liberally and accept all of the plaintiff's factual allegations in the complaint as true. *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2009). "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund v. (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

## III. FACTS

The Complaint alleges a detailed set of facts relevant to E.M.'s Title IX claim. In addition, E.M. attached to her original complaint her personal account of the events at issue in this case.[1] As

---

[1] The original complaint attached two documents that were described as written statements prepared by E.M., which were presented to AISD at a meeting with the assistant principal and an AISD official on January 27, 2017. *See* Dkt. Nos. 1 at ¶ 68; 1-3 and 1-4. The live pleading still

noted, in analyzing a Rule 12(b)(6) motion, the Court takes the factual allegations of the complaint as true. Here, the allegations include both what is pled in the Complaint, as well as what is set forth by E.M. herself in her account of the facts, referenced by the Complaint. The Court will not restate all these allegations, but it is important to summarize the facts that are most material to the motion:

- E.M. first spoke to D.M. at a choir social at the beginning of the school year. She recognized him from her US History class, where she had noticed that he did not seem to have many friends. When they were grouped together at the social for an introductory game she commented to him that they were in history class together.

- E.M got to know D.M better in the history class, as they were seated at the same table. Shortly thereafter E.M. attended a camp at UT to prepare for a UIL choir competition, and saw D.M. there. She approached him and struck up a conversation. After the camp he asked for her number, but because he was having trouble with his phone, he ended up giving E.M. his number instead.

- The next day, remembering she had D.M.'s number, E.M. texted him. The following day, she invited D.M. to sit with her at lunch, because "I just wanted a lonely kid to feel better." She also invited him to study with her at the library, and he "formed a habit of meeting me outside the library every day for my off period. We would walk together and he would sit with me at my table in the library. We hardly spoke but he always sat with me, which I did not mind." E.M. also asked D.M. to meet her for lunch.

- Shortly after this, D.M. asked E.M. out on a date. E.M. said "yes," although she also writes that she did not want to do so—something she did not express to D.M. When she said "yes" to the date, D.M. hugged her, which she also states made her feel uncomfortable, again, something she did not express to D.M. She offered to drive on the date, where they went out for pizza. E.M. felt the date went "fine," but that she was not interested in him as a boyfriend. She specifically states that "[a]t no point in time have [D.M.] and I held hands, kissed, or had any romantic physical contact."

- When D.M. asked her out again, via a text message, E.M. states that "[b]y this time I did not feel comfortable around him," so she "solicited [her] mother's help when replying." Dkt. No. 1-3 at 4. The text back stated, "Yeah I'd love to go hang out

---

includes the reference, stating that at the meeting "E.M. provided written statements and clarified them by answering questions." Dkt. No. 8 at ¶ 69. As they are incorporated into the Complaint, the Court may consider them on a Rule 12(b)(6) motion. *Lone Star Fund*, 594 F.3d at 387.

3

again!! But to be honest, I just moved here and I don't think I'm looking to be in a relationship. Are you okay with just going as friends?" The next day he responded, "Sorry for not replying last night. I'm glad to have you as a friend." This occurred in the first week of October.

- After this time D.M. began acting "clingy," and sought E.M. out at school. He would approach her at lunch or other non-class times and sit or stand nearby. To avoid spending her off period with D.M., E.M. began leaving campus. She avoided him at the library, and stopped waiting for him there, and would not sit at the same table as him. D.M. was unhappy with this, and would often express his displeasure by grunting, rocking back and forth, and making odd noises.

- D.M. attempted on several occasions to get E.M. to give him a ride after school or choir events. He would get into her car without being invited, and would not leave when asked. The first time this happened, E.M. was unhappy, but did not express this and ended up driving him to get tacos. As she described it:

  > I unlocked my car and put my backpack in my car. I was about to say goodbye but then I see him open the passenger door and get inside my car. I was outraged and deeply confused. I got inside the car and tried to ask a few questions about what he was doing. He then expressed to me that he wanted to go to Torchy's Tacos for dinner. Again, I figured that maybe he just had the wrong idea about me because I did not firmly deny that he was not welcome to come with me. However, he was never welcomed into my car, and he was never invited to come to dinner with me. I knew I could not physically remove him from the car myself. So i just took him because I did not want to upset him.

  Dkt. No. 1-3 at 5. When this happened a second time, E.M. was more persistent and D.M. eventually left the car.

- On several occasions, D.M. hugged E.M. E.M. told D.M. she did not want him to hug her, though he nevertheless did so several times after this.

- On October 28, 2016, E.M. sent D,M. a text telling him they needed to talk. He responded saying he had "emotionally prepared [him]self for whatever you're going to say, so I would rather you told me directly, without sugarcoating it." She called him the next day (October 29, 2016), and told him that she was upset about his actions, that he overstepped his bounds, and that she did not want to see him so much anymore.

- During a choir practice in October D.M. threw a tantrum, tearing up his sheet music, falling to the floor, and banging his head. The choir teacher asked the other students to leave and handled things with D.M. privately.[2]

- In this same time frame (the Complaint is silent on the timing), D.M. stabbed his arm with a pen in front of his teachers.[3] This led to D.M.'s parents meeting with a counselor. Among other things, the Complaint alleges that at this meeting, D.M.'s parents expressed concern over D.M.'s obsession with E.M. The Complaint states that the counselor did not inform other school officials of this, nor did she inform E.M. or her parents.

- Though E.M. and D.M. continued to interact at times in the history class and at choir events, E.M.'s account does not mention any other significant events with D.M. for the rest of the fall semester, except she notes seeing D.M. at a winter choir concert. She notes that D. M. approached her, "obviously distraught," and that "[b]oth my mother and father stay close by. He asks me to go someplace more private with him," but she said "no." D.M. asks why E.M. doesn't want to hang out with him anymore, and she tells him "You were and are pushy. I don't want anything to do with that." Though D.M. texts E.M. a few more times, she doesn't reply, and they "never had direct contact after that."

- On January 18, 2017, D.M. lowered himself over a second story railing at the school and let go in front of E.M and other students. He was caught on the floor below by a teacher and was not seriously harmed, although E.M. was not immediately aware of that.

- During the next class, a school counselor pulled E.M. out to the hallway to discuss D.M. Among other things, the counselor informed E.M. that D.M. was obsessed with her, and that is why D.M. dropped from the balcony. In her account E.M. states this is the first time she was aware that D.M.'s behavior was the result of his feelings for her: "I had no idea that his violent tendencies were related to me until this

---

[2]The Complaint states that this event occurred "when E.M. rejected D.M. during choir." Dkt. No. 8 at ¶ 50. But in the account E.M. wrote herself, she does not mention any sort of conversation with D.M., much less "rejecting" him, prior to the incident. Instead, according to her description, "[o]ne song is particularly challenging so we focus on that. At this time, to my horror and to the horror of every student present [D.M.] begins to cry and thrash around. He knocks his chair to the side. He rips his paper, crinkling it up in his hands, and throws himself to the floor." Dkt. No. 1-3 at 7.

[3]The Complaint states that "E.M. observed the wounds on his arms." Dkt. No. 8 at ¶ 51. Oddly, there is no mention of this event in E.M.'s very detailed accounting of her interactions with D.M. in the fall of 2016.

5

moment and it was difficult for me to process. No one informed me of his obsession. I just assumed he was a troubled kid with no friends. I suspected there could be something else at home I did not know about. No one informed me about his obsession." Dkt. No. 1-4 at 3.

- The next day, E.M.'s parents reported to AISD police D.M.'s behavior toward E.M., and met with school officials. On January 25, 2017, they filed a grievance with AISD complaining about a number of things, and insisting that D.M. be expelled from the school. Dkt. No. 1-2. AISD declined to expel D.M., but on January 31, 2017, the school developed a safety plan intended to keep E.M. and D.M. apart while at school. The plan provided that E.M. be escorted to all her classes by a school security guard. It also provided that D.M.'s schedule would be monitored to minimize chance encounters.

- On five occasions throughout the spring semester, D.M. and E.M. interacted in some fashion at school. Most of these involved E.M. simply seeing D.M. in the hallway or on school grounds. On two of these instances, E.M. did not have an escort with her when she saw D.M.. At no time during the five encounters did D.M. speak with E.M., though on one occasion he followed E.M. and her friends through the hallways for several minutes. Their final interaction involved D.M. coming to the choir room for voice practice when E.M. was also there. The Choir Director escorted E.M. into an office connected to the choir room, and shut the door. E.M., however, was able to hear D.M singing and began to have a panic attack. She left the room, having to walk past D.M. and other students.

## IV. ANALYSIS

Title IX states: "No person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "This provision of Title IX may be enforced in a private lawsuit for monetary damages." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1989); *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). Among other things, the statute is intended to prevent gender-based student-on-student harassment. *Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011). A school district that receives federal funds is liable for student-on-student harassment where:

- the school district has actual knowledge of the harassment;

- the harasser is under the school district's control;

- the harassment is based on the victim's sex;

- the harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit;" and

- the school district is deliberately indifferent to the harassment.

*Id.* The Supreme Court has reminded courts to

> bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults . . . . [I]n the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651-52 (1999).

Though AISD challenges several elements of E.M.'s claim, the Court need only address one: whether the Complaint states a plausible claim that AISD was deliberately indifferent to the harassment alleged. As explained by the Fifth Circuit:

> For a school to be liable under title IX, its response, or lack thereof, to the harassment must be clearly unreasonable in light of the known circumstances. *That is a high bar, and neither negligence nor mere unreasonableness is enough.* Schools are not required to remedy the harassment or accede to a parent's remedial demands, and courts should refrain from second-guessing the disciplinary decisions made by school administrators.

*Sanches*, 647 F.3d at 167-68 (internal citations, quotations, and alterations omitted; emphasis added); *see also Davis*, 526 U.S. at 642. That a response to a student's complaint of harassment was ineffective does not necessarily mean that it was unreasonable, nor is a response clearly unreasonable because the misconduct continued. *Sanches*, 647 F.3d at 168. As the Fifth Circuit has noted,

7

something more than this is required to show a school district has been deliberately indifferent. *See id.* at 169 n.10.[4]

In this case, taking E.M.'s allegations as true, no school employee was aware of any harassment until, at the very earliest, D.M.'s parents met with a counselor to discuss D.M.'s self-destructive behavior. E.M. alleges that at this meeting D.M.'s parents informed the counselor that their son was obsessed with E.M. It is not exactly clear when this meeting took place, but from the dates that are present in the Complaint and E.M.'s account it appears to have been in or after late October, and thus in the last six to eight weeks of the fall semester. E.M. herself had not complained to anyone at the school at this time, nor does it appear that she had even informed her parents that she was concerned or upset by D.M.'s behavior toward her.

---

[4]Though the Complaint states clearly that it only raises a claim under Title IX, Dkt. No. 8 at ¶¶ 8, 104-105, it, and the response to the motion to dismiss, nevertheless contain a large amount of additional material, including references to Texas state laws and regulations, AISD policies, and Department of Education communications to schools. *See* Dkt. No. 8 at ¶¶ 25-39 & Dkt. No.16-1. The inclusion of this material suggests that Plaintiffs' counsel is conflating the school's obligations enforceable solely by the DOE, with the school's obligations to a student, enforceable through a private action such as this one. As the Supreme Court has explained, a student cannot sue a school for violating a DOE regulation promulgated pursuant to Title IX. *Gebser*, 524 U.S. at 292 ("We have never held, however, that the implied right of action under Title IX allows recovery in damages for violation of [Title IX] administrative requirements."). Only the DOE or the funding entity may take action against a school for that. 20 U.S.C. § 1682. A student may only recover against a school by demonstrating that the school was deliberately indifferent to severe, pervasive gender-based harassment of which the school had actual knowledge. As a result, whether AISD promulgated the correct policies, or—as E.M. alleges—failed to follow their own or the DOE's policies, cannot form the basis of E.M.'s Title IX claim (though it might be fuel for an enforcement action against AISD by the DOE). More to the point, failing to follow guidance from the DOE or the Texas Association of School Boards, or similar entities is not deliberate indifference. *Gebser*, 524 U.S. at 291-92 ("Lago Vista's alleged failure to comply with the regulations, however, does not establish the requisite actual notice and deliberate indifference."). Thus, E.M.'s detailed complaints about AISD not following its or other entities' policies simply have no place in the deliberate indifference analysis.

As already discussed, to make out a Title IX claim, a plaintiff must demonstrate that the school district was deliberately indifferent to the harassment, which in turn requires that the district had actual knowledge of the harassment. Evidence that the district did not know, but *should* have known of ongoing harassment is not enough to demonstrate deliberate indifference. *Gebser*, 524 U.S. at 288, 290. As a Fifth Circuit panel recently explained, "at its core, the implied Title IX remedy that the Supreme Court recognized depends on meaningful notice to a funding recipient so that it will have an opportunity to remedy the discrimination." *Salazar v. South San Antonio Ind. School Dist.*, 690 Fed. Appx. 853, 860 (5th Cir. 2017). This is because liability under Title IX arises not from the discrimination or harassment itself but from "an official decision by the recipient not to remedy the violation." *Id.* at 862 (citing *Gebser*, 524 U.S. at 290-91). Thus, the question here is, assuming (as alleged) D.M.'s parents expressed concerns to a counselor about their son's fixation with E.M., and assuming further that their report suggested that D.M.'s fixation rose to the level of D.M. posing a risk of sexually harassing E.M., was that enough to give AISD actual notice of Title IX discrimination?

The Supreme Court and lower courts have written extensively about what is needed to put a federal funds recipient on notice of actionable conduct. The focus of Title IX is on the entity's response, not that of any single employee. *Gebser*, 524 U.S. at 290-91 (the actual notice requirement is intended to eliminate the "risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions"). As a result, the Supreme Court has held that:

> a damages remedy [for student-on-student harassment] will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has

9

actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Gebser*, 524 U.S. at 290. Thus, in a high school setting, nearly every court to consider the issue has concluded that an "appropriate person" to notify for Title IX purposes is the high school principal.[5] A school counselor, who was the only individual who possibly was notified about D.M.'s obsession with E.M. prior to the balcony incident, is far different from a principal. For example, the Complaint does not allege that the counselor herself had the "authority to address the alleged discrimination and to institute corrective measures" on AISD's behalf. Rather, the Complaint actually pleads that the counselor was *not* involved in the actions taken to remedy the harassment—the creation of the security plan—which was crafted by the principal and other higher level AISD officials. Dkt. No. 8 at ¶¶ 72-74.

In her response to the motion to dismiss, E.M. contends that "[t]he District argues a School Counselor does not trigger the notice requirements addressed in *Davis* but the District's own policies and procedures speak otherwise," citing to an AISD regulation. Dkt. No. 16 at 1 n.1. As the

---

[5] *See Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1256 (11th Cir.2010) (finding principal, "as the highest-ranking school official on site at Blanche Ely High School," was ''high enough on the chain-of-command to impute liability to the School Board."); *Plamp v. Mitchell Sch. Dist. No. 17–2*, 565 F.3d 450, 457 (8th Cir.2009) ("It is apparent from Supreme Court precedent, however, that school principals are considered 'appropriate persons' in the Title IX analysis."); *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 171 (3d Cir. 2002) ("[W]e think that a school principal who is entrusted with the responsibility and authority normally associated with that position will ordinarily be 'an appropriate person' under Title IX."); *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir.2000) (upholding jury verdict and concluding that student satisfied actual notice requirement where student informed the principal about a teacher's sexual misconduct); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir.1999) (finding "little room for doubt that the highest-ranking administrator at GWHS exercised substantial control of" a harassing student during school hours so that her "knowledge may be charged to the School District"). *See also Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir.2000) (assuming without deciding that the principal was an official with the power to remedy discrimination on behalf of the school district).

regulation is not part of the Complaint, or referenced in it, it is not clear that the Court should consider it. But in the end, it doesn't make a difference, because E.M. has misread the regulation. Rather than stating that a counselor is an "appropriate person" for notice purposes, the regulation makes it clear that a counselor is *not* such a person. First, it instructs any employee who suspects or receives notice that a student has experienced prohibited conduct to notify "the appropriate District official," which it defines to mean "the Title IX coordinator, the ADA/Section 504 coordinator, and the Superintendent." Dkt. No. 16-1 at 4. It then expressly states that reports of discrimination based on sex be made to the Title IX coordinator, and "designates [that] person to coordinate its efforts to comply with Title IX." *Id*. at 5. Later, the regulation provides instructions on how different personnel are to respond to a complaint. In a section titled "Counselor or Administrator," it states that if a counselor learns of an incident of harassment he or she "will meet with the targeted student privately and will assist the student in documenting the incident on a complaint form *in order for the incident to be investigated by the principal or designee*." *Id.* at 10 (emphasis added). Not only does the regulation not give a counselor the responsibility to investigate the complaint, it also delegates the power to remedy any violation, or to otherwise bring the school into compliance with Title IX (which it refers to as "interventions") to "the principal or designee," as well as the Title IX coordinator. *Id.* at 11-13. *Gebser* required that for notice to be sufficient in a Title IX private suit it must be made to "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." 524 U.S. at 290. That is quite plainly not a counselor under AISD's regulation. So, rather than demonstrating that notice to a counselor was adequate to put AISD on actual notice, the regulation cited by E.M. actually demonstrates the exact opposite.

Further, the fact that the report at issue was made by D.M.'s parents has some significance. The situation here is akin to that in the *Gebser* case. There, a teacher was engaging in a sexual relationship with a student. He taught English, and also made sexually suggestive comments during class. In *Gebser* the Court held that when parents of students other than the one the teacher was having a relationship with complained to the principal about the sexual comments in class, that was not enough to give the school actual notice of the inappropriate sexual relationship. *See Gebser*, 524 U.S. at 291. Somewhat analogously, the report here was made by D.M.'s parents, not E.M.'s, and it was made in the context of the parents expressing concerns over their son's behavior, not in a discussion about any harassment of E.M. For this reason as well, it is unlikely that D.M.'s parents' report put AISD on notice of discrimination against E.M.

At the end of the day, this does not matter, however. Because a counselor is not an "appropriate person" for notice purposes under Title IX, as a matter of law the meeting between D.M.'s parents and a school counselor did not put AISD on actual notice that E.M. was being harassed, and thus did not create a duty under Title IX for AISD to take action at that time.

On the other hand, there appears to be little question that AISD was sufficiently put on notice of a problem in January 2017, when, after D.M. dropped off the balcony, E.M.'s parents made a report to AISD police and school administrators. As E.M.'s own pleadings demonstrate, after this apparent suicide attempt, there were numerous meetings and discussions between E.M.'s parents and AISD, leading to the adoption of a safety plan on January 31, 2017. The Complaint reflects that the plan provided E.M. with an escort between classes, and included steps intended to eliminate interactions between D.M. and E.M. as much as possible. The Complaint further pleads that AISD also developed a separate safety plan specifically for choir, assigned a security guard to shadow

12

E.M., and assigned E.M. a new counselor as her parents requested. *See* Dkt. No. 8 at ¶¶ 63, 72, 75, 77, 87. After the plan was implemented, E.M. pleads that she only had five encounters with D.M., none of which involved any direct interaction or even talking between the two students. Though E.M. was clearly very distressed when she saw D.M. at school, and though her parents clearly felt that D.M. should have been expelled from the school, Title IX did not require AISD to expel D.M. As noted earlier, Title IX does not require a school to "accede to a parent's remedial demands."

In fact, even a *failed* attempt to remedy harassment does not violate the statute, so long as the school district actually took steps to try to remedy the problem that in the circumstances were not "clearly unreasonable." AISD's response was more than adequate under this standard. In fact, it did more than make a failed attempt at a remedy. E.M.'s own Complaint shows that the steps taken, though maybe not perfect, were largely successful—no harassment occurred after the plan was implemented, and E.M. only saw or encountered D.M. at school on five occasions over the four months of the spring semester that followed.[6] Though it is apparent that E.M. and her parents feel that AISD should have taken more steps, it was not a violation of Title IX for AISD not to do so. As noted, showing deliberate indifference is a "high bar," and the facts pled by E.M. fall far below that bar—E.M.'s own Complaint shows that AISD simply was not deliberately indifferent to D.M.'s harassment of E.M. "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly

---

[6]The Complaint alleges that E.M. and D.M.'s brief encounters in the hallways and once in the choir room in the spring of 2017 amounted to harassment. This misapprehends the meaning of "harassment" under Title IX. Merely seeing another student who previously harassed the plaintiff is not itself harassment.

13

unreasonable' as a matter of law" under Title IX. *Davis*, 526 U.S. at 650. This is such a case, and E.M.'s Title IX claim should be dismissed.[7]

It is impossible to read the Complaint and E.M.'s own account and not conclude that E.M.'s junior year of high school was a hard year for her. Nothing in the Court's analysis should be taken by E.M. or her parents as not recognizing this. The Court understands that E.M. and her parents are upset about her experiences at the high school related to D.M., and frustrated with the school's response to it. Title IX, however, is a very targeted statute that is primarily focused on ensuring that educational institutions receiving federal funds comply with the terms of Title IX. The statute gives almost all of the power to enforce Title IX to the DOE and funding organizations, and a student's right to sue is extremely limited. In the circumstances of this case, the statute simply does not provide E.M. a right to relief.

## V. RECOMMENDATION

Accordingly, the undersigned **RECOMMENDS** that the District Court **GRANT** Austin Independent School District's Motion to Dismiss (Doc. No. 13), and **DISMISS** this case for failure to state a claim. **IT IS FURTHER ORDERED** that this case is **REMOVED** from the docket of the undersigned.

---

[7]The Complaint purports to state a claim by E.M.'s parents for monetary damages. Dkt. No. 8 at ¶¶ 109-110. As AISD notes, parents lack standing under Title IX to seek their own damages. 20 U.S.C. § 1681(a). In their Response, the parents agree that they lack standing to sue, but nevertheless assert they have a right to be reimbursed for their out of pocket expenses, without explaining how that can be possible if they lack standing to sue. Regardless, because E.M. cannot state a Title IX claim, her parents' claim cannot succeed as well.

## VI. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 30th day of January, 2018.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE